IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32174-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY L. RIEKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Jeffrey Rieker assigns numerous errors to his convictions for

possession of stolen property, possession of a stolen motor vehicle, unlawful manufacture

of marijuana, unlawful possession of a firearm, and bail jumping. We affirm the trial

court's denial of Rieker's motion to suppress and hold that sufficient evidence supports

his convictions. We remand the case, however, for further review of his sentencing.

FACTS

On October 11, 2011, the Chelan County Sheriff's Office entertained a report of

theft of tools from A&W Paving and Ridgeview Plumbing, two businesses housed in the

same Cashmere building. Sheriff Deputy Brent Patterson journeyed to the businesses and

created a list of missing tools.

On January 12, 2012, the Chelan County Sheriff's Office executed a search warrant at a Peshastin shop owned by defendant Jeffrey Rieker. Material evidence gathered during the search led to the prosecution of Rieker. Lance Smith supplied information utilized by law enforcement to gain the warrant. That information now follows.

On November 23, 2011, Lance Smith ended two years of employment with Jeffrey Rieker because of a wage dispute and Smith's disapproval of Rieker's lifestyle. Both Rieker and Smith were convicted felons, but Rieker had not ended his life of crime. Rieker received and exchanged stolen property for drugs or money. Rieker hid stolen tools and other property in the walls of Rieker's shop. Rieker employed an 18-inch space between the inner and outer walls of his shop, which space was accessed by removing screws securing the inner wall panel. Rieker boasted to Smith about amassing stolen tools and paying a scant sum for the tools from local youth he commissioned to steal.

Lance Smith saw an AK-47 assault rifle at least two times in Jeffrey Rieker's shop. Rieker requested that Smith take the assault rifle because Rieker was a felon. Rieker worried that his neighbor might eye him with the rifle and report him to law enforcement. Smith refused to take custody of the rifle since Smith was also a convicted felon. At the time Rieker asked Smith to take the assault rifle, Rieker informed Smith that the former usually hid the firearm in a culvert on his shop property. A green fiberglass lid covered the culvert top, which emerged two feet from the ground. The

culvert lay past the junction of two dirt roads that led to the shop, but in the woods fifty feet to the northwest of the juncture.

On the last day of his employment in November 2011, Lance Smith observed some tools for the first time in Jeffrey Rieker's shop. Smith saw a 110-volt Mig welder, a 220-volt industrial Mig welder, a plasma cutter, a Hilti diamond coring concrete motor, a Wirsbo expander tool, a handheld Milwaukee band-saw with the words "Ridgeview Plumbing" written thereon, an orange power snake plumbing tool, a Black & Decker drill, and security monitoring system with four cameras still contained in its original box. Clerk's Papers (CP) at 5. Smith questioned Rieker about the acquisition of the tools and Rieker supplied no response. Smith assumed the tools were stolen.

In late November 2011, Lance Smith encountered Tanner Schwind in Leavenworth. Schwind was close friends with Smith's stepson. On previous occasions, Schwind boasted to Smith of criminal acts the former performed on behalf of Jeffrey Rieker. In late November, Schwind crowed to Smith about filling a "shopping list" of tools Rieker requested him to steal. CP at 5. Schwind claimed he stole tools, now housed in Rieker's shop, from a plumbing business, in Cashmere. Schwind found humor in fulfilling Rieker's wish list at one location.

Lance Smith telephoned Robert McLeod, owner of Ridgeview Plumbing. Smith asked McLeod if the latter had been burgled, and Smith disclosed that he might know the thief. McLeod encouraged Smith to notify law enforcement.

In January 2012, Lance Smith reported the misconduct of Jeffrey Rieker to the Chelan County Sheriff's Office. On January 3, 2012, Sheriff Detective Mitch Matheson conducted and recorded an interview of Lance Smith. Smith related the above information to Detective Matheson. Smith added that the tools likely remain in the possession of Rieker. Smith brought with him to the interview the power snake plumbing tool. The plumbing tool had a sticker affixed to it. Smith explained that Rieker gave him the tool because it did not work and Rieker hoped Smith would repair the tool.

After interviewing Lance Smith on January 3, Detective Mitch Matheson contacted Robert McLeod, owner of Ridgeview Plumbing. Matheson described the tools that Lance Smith reportedly saw at Jeffrey Rieker's shop, and McLeod identified the tools as being stolen from his business. McLeod told Matheson that he did not know Rieker or Smith. McLeod styled the Wirsbo expander and diamond coring motor as rare and expensive plumbing tools. McLeod identified the power snake tool as his based on the white sticker it bore. McLeod told Detective Matheson that he previously received a call from Smith about the stolen goods.

Detective Mitch Matheson deposited Jeffrey Rieker's information in an affidavit supporting a warrant to search Jeffrey Rieker's property. Matheson noted that Tanner Schwind was incarcerated in Kittitas County Jail as of January 2012. Chelan County Judge John Bridges signed the warrant on January 5, 2012. The warrant authorized law enforcement to search Jeffrey Rieker's cabin and shop, off Highway 97 in Peshastin, for

4

items reported stolen by A&W Paving and Ridgeway Plumbing.

On January 12, 2012, Chelan County Sheriff's Office Detective Mitch Matheson and members of the Chelan County Regional SWAT team executed the search warrant. In searching Jeffrey Rieker's property, the team recovered: (1) nearly all the tools reported stolen by Ridgeview Plumbing and A&W Paving, worth approximately $20,000; (2) a Ruger 10-22 .22 caliber rifle and a Titan .25 caliber semi-automatic handgun; (3) a white 2000 GMC S10 pickup, which had been reported stolen from Leavenworth two days prior; (4) equipment for growing marijuana and making hashish; and (5) methamphetamine. After discovering evidence of the marijuana grow operation in Rieker's shop, an officer of the Columbia River Drug Task Force requested and obtained an additional search warrant to search Rieker's property for evidence of drug contraband. The task force executed the second warrant on January 12.

After being arrested, Jeffrey Rieker waived his *Miranda* rights and spoke with Detective Mitch Matheson. Rieker admitted to receiving the tools from Tanner Schwind and maintained that he paid Schwind $2,000 for the tools. Rieker told Matheson that Schwind insisted that he obtained the tools from someone as payment for a debt. When questioned about the GMC S10, Rieker stated that he purchased the pickup for $200. He conceded that the truck might be worth $700 to $1,000 wholesale, or $2,000 retail. Detective Matheson later determined the actual retail value of the truck to be $3,500 to $4,000.

5

PROCEDURE

The State of Washington charged Jeffrey Rieker with possessing stolen property in the first degree, possession of a stolen vehicle, unlawful manufacture of marijuana, unlawful possession of a firearm in the second degree, and bail jumping. Rieker moved to suppress all evidence recovered in the searches of his property and to dismiss all charges flowing from those searches. Rieker also moved the court for a *Franks v. Delaware* hearing, while arguing that Detective Mitch Matheson's probable cause affidavit omitted material information about crimes of dishonesty in Lance Smith's criminal record. Rieker argued that Matheson intentionally omitted information of Smith's unhappiness with Rieker because Rieker interfered with Smith's visitation with his child. Finally, Rieker contended that Detective Matheson intentionally excluded information showing that Tanner Schwind, to whom Smith claimed to have spoken in November 2011, had been incarcerated in Kittitas County Jail since October 29, 2011.

The trial court denied Jeffrey Rieker's motion to suppress. The trial court entered the following findings of fact, which Rieker challenges on appeal:

> 1. In regard to the staleness issue, tools are less transitory in nature and are not easily discarded or consumed as compared to a controlled substance. Looking at the nature of the criminal activity, and the character of the evidence to be seized in this case, tools are not typically something that disappear, are consumed, or thrown away. Further, the witness, Mr. Smith gave information to the police about being on the defendant's property on several occasions so he would have at least some factual basis for saying that the defendant is not one to get rid of tools. When Mr. Smith came in to speak with the police he had in his possession one of the tools

6

that he stated was given to him by the defendant. This tool was confirmed as being one of the tools that had been reported as stolen. In addition, Mr. Smith specifically relayed information about the defendant having a hiding place between the walls where he would store stolen tools. This would factually support the inference that the defendant would still have the tools in question, rather than discard them.

. . . .

4. In this case it was disclosed that Mr. Smith did have a felony history. The fact that specific history wasn't cited does not show that its omission was knowing and intentional, or done with reckless disregard for the truth. In regard to the specific crimes of "Larceny" that Mr. Smith had on his record, these were two fairly old crimes, one being a misdemeanor and one a felony from out of state, occurring over ten years ago. This court does not see how it would have materially changed Judge Bridges['] assessment of whether there was probable cause for the issuance of the search warrant.

5. With respect to the dispute between Mr. Smith and the defendant, no evidence was submitted to show that the law enforcement officer even knew of the dispute, or that the dispute was of a criminal nature, which it was not. There was no showing that the officer, by not asking additional questions of Mr. Smith to acquire that dispute information, was recklessly disregarding the truth.

6. In regard to the issue about Mr. Schwind possibly being in jail in Kittitas County on the days that Mr. Smith claimed to have spoken with him in Chelan County about the defendant, it appears that the officer could have been negligent in not confirming what days Mr. Schwind was in and out of jail. However, this does not appear to be an issue of the officer acting with reckless disregard for the truth or knowingly and intentionally.

7. If we are to assume that the information about Mr. Schwind should have been part of the search warrant, then the question would be whether that additional information would have significantly changed the finding of probable cause by Judge Bridges. When looking at the totality of the specific information that was provided by Mr. Smith, which was corroborated by other reliable sources, such as producing a tool stolen from the alleged victim, this court does not believe it would have changed the determination that there was probable cause.

CP at 165-67.

Jeffrey Rieker waived his right to a jury trial and proceeded to a stipulated facts bench trial. The trial court found Rieker guilty on all five charges. The State requested that Rieker remain out of custody pending sentencing, as the bail bondsperson agreed to extend Rieker's bail for that period of time. The trial court set Rieker's sentencing hearing for June 5, 2013.

On June 5, 2013, Jeffrey Rieker failed to appear at his sentencing hearing. The State, under a new cause number, charged Rieker with bail jumping. On January 8, 2014, Rieker finally appeared in court for sentencing. The trial court continued sentencing for one day in light of a plea agreement Rieker and the State were negotiating regarding the new bail jumping charge.

On January 9, 2014, the trial court signed and entered findings of fact and conclusions of law for the CrR 3.6 hearing and the stipulated facts bench trial. The trial court also sentenced Jeffrey Rieker for the five crimes charged in 2012. The State informed the trial court of an agreement reached with Rieker, in which Rieker would serve a sixty-month sentence for the 2012 theft and drug charges and receive a fifty-five-month Drug Offender Sentencing Alternative (DOSA) sentence on the 2013 bail jumping charge, in exchange for pleading guilty to that charge.

The trial court asked Jeffrey Rieker's defense counsel for a response to the State's recommendation. Counsel stated: "Well, Your Honor, the agreement in this case is the high end and the maximum, which is 60 months, based on our global agreement. So

8

there's not much I can say. It's an agreement, so I'd ask the Court to impose the high end

in this case." Verbatim Report of Proceedings (VRP) (Jan. 9, 2014) at 21-22. The trial

court also asked Rieker if he wished to speak. Rieker replied "DOSA would probably be

helpful." VRP (Jan. 9, 2014) at 22.

The trial court engaged Jeffrey Rieker in a colloquy about his recent descent into

criminality, as Rieker had not committed a crime since 1993:

> THE COURT: So what—I mean, why is that? What – I mean, no
> offense, you look rather disheveled. Maybe that's due to staying in the jail,
> but you looked pretty disheveled when you came in from being on the lam.
> You went from a person who was trying to be involved with your kid to a
> person with multiple felony convictions looking at a very long time in
> prison.
> THE DEFENDANT: Drugs.
> THE COURT: Marijuana or other drugs?
> THE DEFENDANT: Not marijuana.
> THE COURT: Methamphetamine?
> THE DEFENDANT: (Nods head.)
> THE COURT: When did you start using meth?
> THE DEFENDANT: Three, four years ago.
> THE COURT: How long?
> THE DEFENDANT: Three or four.
> THE COURT: And how did that happen? How did it start?
> THE DEFENDANT: You mean, like, did somebody offer me
> some?
> THE COURT: Well, yeah, I mean, seriously, because I don't think
> there's probably anybody else in this room who's ever used
> methamphetamine.
> THE DEFENDANT: Somebody offered me some.
> THE COURT: And you said yes.
> THE DEFENDANT: Yeah.
> THE COURT: All right. Okay. Well, we'll talk more about the
> DOSA on the next case . . .

VRP (Jan. 9, 2014) at 23-24.

The trial court accepted the State's recommendation and sentenced Jeffrey Rieker to sixty months of confinement for the 2012 charges. The trial court also ordered Rieker to undergo a chemical dependency evaluation and to follow all recommended treatment. Nevertheless, the trial court did not check the box on the judgment and sentence finding that Rieker had a "chemical dependency" that contributed to his criminal offenses. The trial court ordered Rieker to submit to random urinalysis at his own expense and to refrain from consuming alcohol as part of community custody conditions. Finally, the trial court ordered that Jeffrey Rieker pay $1,850 in legal financial obligations (LFOs). The record does not show that the trial court inquired into Rieker's ability to pay the obligations. After sentencing Jeffrey Rieker, the trial court accepted his guilty plea to one count of bail jumping in 2013, and sentenced him to fifty-five months total confinement, consecutive to the sixty months for Rieker's 2012 crimes, with half of the 2013 sentence to be served in DOSA community custody.

## LAW AND ANALYSIS

Jeffrey Rieker contends on appeal that: (1) the warrant issued to search his property lacked probable cause, (2) the trial court erred in denying his request for a *Franks* hearing, (3) the trial court exceeded its authority in imposing conditions of community custody not authorized by statute, and (4) the trial court erred in requiring Rieker to pay LFOs without considering his financial resources and ability to pay. We

10

hold that probable cause supported the search warrant, and thus we affirm Rieker's convictions. We affirm the trial court's community custody conditions. We vacate and remand for further hearing some of the legal financial obligations imposed on Rieker.

*Issue 1: Whether probable cause substantiated the search warrant for Jeffrey Rieker's property?*

*Answer 1: Yes.*

Jeffrey Rieker first contends that the trial court erred in denying his motion to suppress evidence obtained in the search of his property. Rieker assigns error to findings of fact 1, 4, 5, 6, and 7 in the trial court's order denying his motion. Rieker argues that the information included in Detective Matheson's affidavit of probable cause failed to establish Lance Smith's veracity and basis of knowledge and that law enforcement's efforts to corroborate Smith's information did not remedy the affidavit's deficiencies. The State of Washington responds that probable cause supported the issuance of a search warrant because Smith was a named informant who provided detailed information about stolen property he personally observed in the place to be searched.

Challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, when the findings are unchallenged, they are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Evidence is substantial if it persuades a fair-minded, rational person of the declared premise. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). When the parties

11

present conflicting evidence, appeals courts defer to the trial court. *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985).

We address each of Jeffrey Rieker's challenges to the trial court's findings of fact. Substantial evidence supports finding of fact 1. As the trial court correctly found, Lance Smith provided detailed and critical evidence supporting an inference that Rieker still possessed the stolen tools. Smith's information included the nontransitory nature of the tools, as opposed to the transitory nature of drugs; Rieker building a secret panel in which to hide the tools; Smith's experience working on Rieker's property; and Smith's possession of one of the tools confirmed by Robert McLeod as stolen. Smith's meticulous information sufficed to persuade a fair-minded, rational person that Smith told the truth and Rieker's property would retain the tools. Smith's possession of one of the stolen tools alone was persuasive.

Based on finding of fact 1, the court did not err in finding that probable cause supported issuance of a search warrant for Jeffrey Rieker's property. This court reviews a trial court's decision to issue a search warrant for abuse of discretion, giving great deference to the issuing judge. *State v. Neth*, 165 Wn.2d 177, 182, 196 P.3d 658 (2008). At the suppression hearing the trial court acts in an appellate-like capacity; its review, like ours, is limited to the four corners of the affidavit supporting probable cause. *Neth*, 165 Wn.2d at 182. Although we defer to the magistrate's determination, the trial court's assessment of probable cause is a legal conclusion we review de novo. *Neth*, 165 Wn.2d

12

at 182. The trial court must determine if the warrant is valid by considering only the information brought to the attention of the issuing judge or magistrate at the time the warrant was requested. *State v. Garcia-Salgado*, 170 Wn.2d 176, 187, 240 P.3d 153 (2010).

The Fourth Amendment and article I, section 7 of Washington's Constitution require that a search warrant issue only on a determination of probable cause by a neutral magistrate. *State v. Myers*, 117 Wn.2d 332, 337, 815 P.3d 761 (1991). Probable cause exists when facts and circumstances suffice to establish a reasonable inference that the defendant is involved in criminal activity and that evidence of the criminal activity can be found at the place to be searched. *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004); *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). While the affidavit need not make a prima facie showing of criminal activity, it must show criminal activity is at least probable. *State v. Ellis*, 178 Wn. App. 801, 805-06, 327 P.3d 1247, *review denied*, 180 Wn.2d 1020, 353 P.3d 641 (2014).

Washington courts utilize the *Aguilar/Spinelli* test to evaluate whether an informant's tip establishes probable cause for a search warrant. *State v. Jackson*, 102 Wn.2d 432, 443, 688 P.2d 136 (1984) (citing *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964)). An informant's tip is sufficient to establish probable cause when the officer's affidavit sets forth (1) the underlying circumstances from which the informant

13

drew his conclusions, such that a magistrate can independently evaluate the informant's "basis of knowledge"; and (2) the underlying circumstances from which the officer determined the "veracity" of the informant or information. *Jackson*, 102 Wn.2d at 435-36.

On appeal, Jeffrey Rieker challenges Detective Mitch Matheson's probable cause affidavit on both grounds of the *Aguilar/Spinelli* test. Rieker argues that the affidavit fails to detail Smith's basis of knowledge because the affidavit only contains Smith's personal belief that the tools on Rieker's property were stolen. Interestingly, Rieker also relies on his vague answer to Smith about the origin of the tools to illustrate Smith lacked a basis to claim tools were stolen.

Jeffrey Rieker misrepresents the contents of the probable cause affidavit. He ignores the many percipient observations supplied by Lance Smith in addition to Smith's belief that the subject tools were stolen. Observations are sufficient to establish an informant's basis of knowledge when the informant provides enough firsthand factual information for either an affiant officer or a magistrate to independently determine whether a crime has likely been committed. *See State v. Ibarra*, 61 Wn. App. 695, 702, 812 P.2d 114 (1991). Smith's wealth of information included the presence of distinctive markings on the tools, Rieker's inability to clarify the origin of the tools, Smith's observation of a hidden panel in Rieker's shop, and Smith's possession of one of the purloined tools. Rieker conveniently forgets that Detective Mitch Matheson confirmed

14

that, based on distinctive markings, the tool in Smith's possession belonged to Ridgeview Plumbing.

Jeffrey Rieker also contends that the probable cause affidavit does not establish the veracity of Lance Smith as an informant. Rieker maintains that the history of conflict between Smith and him negates Smith's reliability as an informant because of Smith's motive to falsify information as a means of revenge on Rieker. Relatedly, Rieker challenges the sufficiency of the trial court's finding of fact 5 that Detective Matheson was unaware of a conflict between Rieker and Smith.

Substantial evidence supported the trial court's determination that Mitch Matheson was unaware of a dispute between Lance Smith and Jeffrey Rieker regarding Smith's visitation with his child. Rieker emphasizes an affidavit submitted by his attorney, which affidavit declares that Detective Matheson heard about this particular conflict. Nevertheless, the affidavit does not disclose when Matheson told the attorney when the former learned of this conflict between the two. The trial court heard no evidence indicating that Detective Matheson knew about this conflict when he prepared the probable cause affidavit. Accordingly, the trial court did not err in making its finding of fact 5.

Lance Smith did not seek to hide as a confidential informant. Smith's status as a named citizen informant, coupled with the detailed information he provided to law enforcement, establishes his reliability as an informant under *Aguilar/Spinelli*. When the

15

informant is an ordinary citizen, as opposed to the criminal or professional informant, and his identity is revealed to the issuing magistrate, intrinsic indicia of the informant's reliability may be found in his detailed description of the underlying circumstances of the crime observed or about which he had knowledge. *State v. Northness*, 20 Wn. App. 551, 557, 582 P.2d 546 (1978); *State v. Berlin*, 46 Wn. App. 587, 590, 731 P.2d 548 (1987). The "reliability" prong is "relaxed" when a citizen informant furnishes information, so long as that information supports his basis of knowledge and sustains an inference that he is telling the truth. *State v. Franklin*, 49 Wn. App. 106, 109, 741 P.2d 83 (1987).

Additional factors establish the credibility of Lance Smith. Smith approached both Robert McLeod and law enforcement without concealing his identity. Although the probable cause affidavit does not mention the visitation conflict between Rieker and Smith, the affidavit discloses a wage dispute between the two, a dispute arguably as valid a reason to falsify information. In short, the trial court did not err in concluding that Detective Matheson's affidavit established probable cause for a search warrant.

*Issue 2: Whether the trial court erred in denying Jeffrey Rieker's motion for a* Franks *hearing?*

*Answer 2: No.*

Jeffrey Rieker next contends that the trial court erred in denying him a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Rieker sought the *Franks* hearing to determine whether Detective Matheson

16

knowingly and intentionally, or with reckless disregard for the truth, included false statements by Lance Smith or omitted material information from the affidavit supporting probable cause. Rieker argues that Detective Matheson's recording of the interview with Smith does not contain all statements attributed to Smith that Matheson included in the probable cause affidavit. Rieker emphasizes this inconsistency and the omissions of Smith's complete criminal history, all past conflicts between Smith and Rieker, and the dates of Tanner Schwind's incarceration from the affidavit. Relatedly, he assigns error to the trial court's findings of fact 4, 6, and 7.

The United States Supreme Court wrote in *Franks v. Delaware*:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155-56. Under Washington law, the defendant may also garner a *Franks* hearing when an affiant omitted material information from a probable cause affidavit. *State v. Cord*, 103 Wn.2d at 367. A showing of mere negligence or inadvertence is insufficient. *State v. Chenoweth*, 160 Wn.2d 454, 462, 158 P.3d 595 (2007). Allegations of an affiant's impropriety must be accompanied by an offer of proof. *State v. Garrison*,

17

118 Wn.2d 870, 872, 827 P.2d 1388 (1992). Presenting the content of the omission as the offer of proof of reckless disregard is insufficient. *Garrison*, 118 Wn.2d at 873.

Substantial evidence supports the trial court's findings of fact 4, 6, and 7. These findings, in turn, support the trial court's conclusion that Rieker was not entitled to a *Franks* hearing in this case. The trial court correctly found that the omission of Lance Smith's old, out-of-state convictions for theft crimes did not materially change whether Judge Bridges would find probable cause for a search warrant to issue. The lack of specific information as to Smith's entire criminal history does not entitle Rieker to a *Franks* hearing because he cannot meet his initial burden of showing that the omission was made knowingly, intentionally, or with reckless disregard for the truth. Moreover, Detective Matheson informed Judge Bridges that Smith was a convicted felon and that his most recent brush with the law concerned his failure to appear at a court date. Rieker makes no offer of proof to support his allegation that Detective Matheson intentionally or recklessly omitted the rest of Smith's criminal history.

The trial court correctly found in findings of fact 6 and 7 that Detective Matheson was negligent in failing to confirm Tanner Schwind's dates of incarceration. Nevertheless, this negligence, in light of other information provided by Lance Smith and corroborated by Mitch Matheson, would have not changed Judge Bridges initial determination of probable cause. Schwind's actual dates of incarceration contradicted Smith's account of the timing of his conversation with Schwind regarding the stolen tools

18

on Jeffrey Rieker's property. Rieker argues that Detective Matheson's failure to confirm whether Schwind was in jail on the day Smith allegedly spoke to him amounts to a reckless disregard for the truth, but the failure is also consistent with mere negligence. As noted above, negligence is insufficient to meet a defendant's burden of showing intentional or reckless omission of material facts. *Chenoweth*, 160 Wn.2d at 462.

Jeffrey Rieker may not rely solely on the content of an omission as an offer of proof. The accused must show that the omitted information would have controlled the magistrate's initial finding of probable cause. *Garrison*, 118 Wn.2d at 874-75. Smith's inconsistent story about speaking with Schwind might hurt his credibility, but it would not have changed Judge Bridges' determination in light of the significant amount of untainted, corroborative evidence also included in the affidavit.

*Issue 3: Whether the trial court unlawfully imposed conditions of community custody prohibiting Jeffrey Rieker from consuming alcohol, barring him from frequenting places whose principal source of income is alcohol sales, and requiring him to submit to random urinalysis or BAC (blood alcohol concentration) tests at his own expense?*

*Answer 3: No, as to the prohibition against alcohol and the requirement of urinalysis. Yes, as to frequenting taverns and undergoing blood alcohol tests.*

Jeffrey Rieker next contends that the trial court erred in imposing community custody conditions not authorized by statute. He argues that conditions that preclude him from consuming alcohol, that ban him from taverns, and that require him to submit to

random urinalysis or blood alcohol concentration tests at his own expense are not, as required by RCW 9.94A.505, related to his crimes. The State contends that Rieker agreed to these community custody conditions as part of an agreement regarding his sentencing on the 2012 charges and his guilty plea for the 2013 charge of bail jumping.

No copy of a plea agreement exists in the record. The verbatim report of proceedings includes discussion of an agreement as to sentencing and the trial court's acceptance of Jeffrey Rieker's guilty plea to the 2013 bail jumping. The State mentioned community custody conditions in its sentencing recommendation to the trial court, but no copy of a guilty plea or other agreement confirms that Rieker expressly agreed to the community custody conditions he now appeals. Thus, we reject the State's reliance on any agreement.

At his sentencing, Jeffrey Rieker did not object to the imposition of any community custody conditions. Nevertheless, a defendant may challenge an erroneously imposed sentence for the first time on appeal. *State v. Bahl*, 164 Wn.2d 739, 744, 193 P.3d 678 (2008); *State v. Ford*, 137 Wn.2d 472, 477, 973 P.2d 452 (1999). This court reviews crime-related community custody conditions for an abuse of discretion. *State v. Brooks*, 142 Wn. App. 842, 850, 176 P.3d 549 (2008).

RCW 9.94A.505(8) prescribes:

> As a part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in this chapter.

20

In turn, RCW 9.94A.030(10) reads:

> "Crime-related prohibition" means an order of a court *prohibiting conduct that directly relates to the circumstances of the crime* for which the offender has been convicted, and shall not be construed to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct. . . .

(Emphasis added.)

A trial court may order an offender to refrain from consuming alcohol as part of any term of community custody. RCW 9.94A.703(3)(e); *State v. Jones*, 118 Wn. App. 199, 207, 76 P.3d 258 (2003). A trial court may further require an offender to participate in a rehabilitative program or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community. RCW 9.94A.703(3)(d). Nevertheless, before a trial court may order attendance at a rehabilitative program, evidence must show that alcohol contributed to the offense. *Jones*, 118 Wn. App. at 207-08.

In *State v. Jones*, this court struck community custody conditions requiring Everett Jones, who pled guilty to first degree burglary, to participate in alcohol and mental health treatment and counseling. This court held that conditions imposed as "rehabilitative programs" or "affirmative conduct," under RCW 9.94A.703(3)(d), must be supported by evidence in the record or found by the trial court to be related to the underlying offense. The court reasoned that allowing courts to order a rehabilitation program, regardless of the program's relationship to the underlying offense, would render superfluous former

21

RCW 9.94A.700(5)(c), which, like RCW 9.94A.505(8), provided that trial courts could order an offender to "participate in crime-related treatment or counseling services." *Jones*, 118 Wn. App. at 207 (internal quotation marks omitted). At the same time, this court upheld a condition prohibiting Jones from consuming alcohol, holding that, consistent with the plain language of RCW 9.94A.703(3)(e), a trial court could impose the prohibition regardless of whether alcohol contributed to the commission of the underlying crime.

Under *State v. Jones*, Jeffrey Rieker's trial court did not abuse its discretion in ordering Rieker to refrain from consuming alcohol as a community custody condition. Nevertheless, the trial court exceeded its statutory sentencing authority by requiring Rieker to submit to random urinalysis and blood testing, and prohibiting him from frequenting any tavern or cocktail lounge.

During a colloquy with the trial court, Jeffrey Rieker conceded that his crimes resulted from his abuse of methamphetamine use. Rieker agreed that a DOSA sentence "would probably be helpful" to his rehabilitation. VRP (Jan. 9, 2014) at 22. This evidence supports the trial court's imposition of rehabilitative programs such as undergoing random urinalysis. No evidence suggested that Jeffrey Rieker consumed alcohol or that alcohol led to any of his crimes. Thus, the trial court exceeded its sentencing authority when it prohibited Rieker from frequenting taverns and bars and requiring him to submit to blood alcohol concentration tests.

22

*Issue 4: Whether the trial court unlawfully ordered Jeffrey Rieker to undergo a chemical treatment evaluation and submit to any recommended treatment?*

*Answer 4: No.*

Jeffrey Rieker also argues that the trial court exceeded its sentencing authority by requiring him to undergo a chemical dependency evaluation and submit to any recommended treatment. We disagree.

The controlling statute is RCW 9.94A.607(1), a section of Washington's Sentencing Reform Act (SRA) of 1981 ch. 9.94A RCW. The statute reads:

> Where the court finds that the offender has a *chemical dependency* that has *contributed to his or her offense*, the court may, as a condition of the sentence and subject to available resources, order the offender to participate in rehabilitative programs or otherwise to perform affirmative conduct reasonably related to the circumstances of the crime for which the offender has been convicted and reasonably necessary or beneficial to the offender and the community in rehabilitating the offender.

(Emphasis added.) This statute authorizes the trial court to order an offender to obtain a chemical dependency evaluation and to comply with recommended treatment only if it finds that the offender has a chemical dependency that contributed to his or her offense. *State v. Warnock*, 174 Wn. App. 608, 612, 299 P.3d 1173 (2013).

Jeffrey Rieker admitted to use of methamphetamine for at least three years. Rieker informed the trial court that abuse of methamphetamine led to his return to crime. The trial court imposed a DOSA sentence that is warranted only in the event of a chemical dependency. Rieker agrees a DOSA sentence was warranted. Therefore, we

23

affirm the community custody condition of a chemical dependency evaluation and any recommended treatment.

*Issue 5: Whether the trial court improperly imposed legal financial obligations without considering Jeffrey Rieker's financial resources under RCW 10.01.160(3)?*

*Answer 5: Yes, as to discretionary legal financial obligations.*

Jeffrey Rieker contends that the trial court improperly required him to pay legal financial obligations without considering his financial resources under RCW 10.01.160(3). He challenges a $450 fee for a court appointed attorney, $200 in court costs, a $500 fee to the drug enforcement fund of the Columbia River Drug Task Force, and a $100 crime lab fee. Rieker does not challenge the $500 victim penalty assessment or $100 DNA (deoxyribonucleic acid) collection fee, as neither requires courts to consider a defendant's ability to pay. *State v. Kustler*, 175 Wn. App. 420, 424, 306 P.3d 1022 (2013).

Jeffrey Rieker did not object to the challenged obligations before the trial court. He argues that he may still assert error for the first time on appeal under RAP 2.5. The State again argues that Rieker's claimed error is precluded by his plea agreement and the invited error doctrine. We exercise our discretion in reaching the issue and remand for the trial court to properly determine whether Rieker has, or will have, the ability to pay the legal financial obligations.

Courts may impose legal financial obligations if a defendant has or will have the

24

financial ability to pay them. RCW 10.01.160; RCW 9.94A.760(2); *State v. Curry*, 118 Wn.2d 911, 914-16, 829 P.2d 166 (1992). RCW 10.01.160(3) proscribes:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

In *State v. Blazina*, 182 Wn.2d 827, 838, 344 P.3d 680 (2015), the Washington Supreme Court clarified that RCW 10.01.160(3) requires the trial court "do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." Rather, the "record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay." *Blazina*, 182 Wn.2d at 838. This inquiry includes evaluating a defendant's financial resources, incarceration, and other debts, including restitution. *Blazina*, 182 Wn.2d at 838-39.

We first decide whether to address this assignment of error when Jeffrey Rieker did not object to the imposition of financial obligations before the lower court. RAP 2.5(a) provides, in relevant part: "The appellate court may refuse to review any claim of error which was not raised in the trial court." Our high court clarified: "A defendant who makes no objection to the imposition of discretionary LFOs at sentencing is not automatically entitled to review." *Blazina*, 182 Wn.2d at 832 (footnote omitted). "Each appellate court must make its own decision to accept discretionary review [of claimed LFO errors not appealed as a matter of right]." *State v. Blazina*, 182 Wn.2d at 835.

25

Nevertheless, the *Blazina* court also clarified that a challenge to the trial court's entry of an LFO order under RCW 10.01.160(3) is nevertheless ripe for judicial determination. *Blazina*, 182 Wn.2d at 832 n.1.

The *Blazina* court noted reasons for review of legal financial obligations before collection activities. A judgment for legal financial obligations accrues interest at a high rate, employment and housing background checks show an active record in the superior court as a result of the obligations, and the judgment for the financial obligations impairs the obligor's credit. In short, pending legal financial obligations increase the difficulty of a defendant in reentering society. Therefore, we follow the spirit and purpose of both RCW 10.01.160 and *Blazina* by reviewing the record here to determine whether the trial court engaged in an on-the-record inquiry as to Jeffrey Rieker's ability to pay financial obligations.

The record shows no inquiry into Jeffrey Rieker's past or future financial capability. Rieker is a currently incarcerated indigent defendant, both characteristics about which the Supreme Court instructed trial courts to include in their inquiry under RCW 10.01.160(3). *Blazina*, 182 Wn.2d at 838-39. We remand the judgment and sentence to the trial court, with instructions to reset Rieker's legal financial obligations after conducting the required inquiry into his present and future ability to pay.

## CONCLUSIONS

We affirm Jeffrey Rieker's many convictions. We remand with instructions to

26

No. 32174-6-III
*State v. Rieker*

strike community custody conditions prohibiting Jeffrey Rieker from visiting bars or taverns and demanding that he submit to random BAC testing. We also remand with instructions for the trial court to reestablish legal financial obligations after conducting the required inquiry into Rieker's past and future ability to pay.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

*Fearing, J.*

Fearing, J.

27

No. 32174-6-III

LAWRENCE-BERREY, J. (concurring) — I write separately to express why review of an unpreserved discretionary legal financial obligation (LFO) argument is sometimes appropriate.

RCW 10.01.160(1) states, "The court may require a defendant to pay costs." RCW 10.01.160(2) describes what items can be assessed as costs and sets forth limitations on the financial amounts of certain costs. RCW 10.01.160(3) provides:

> The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

The statute does not require the defendant to prove anything. Rather, the statute prevents the trial court from imposing costs, sometimes referred to as discretionary LFOs, unless the defendant is or will be able to pay them. This places the burden of evidentiary production on the State.

Some trial courts routinely order defendants to pay thousands of dollars of discretionary LFOs despite the absence of evidence that the defendant has or will have the ability to pay those costs. Our Court of Appeals has previously avoided correcting these obvious errors, asserting that defendants waived the issue. The purported rationale for finding waiver is that a defendant has a great incentive not to raise the question of his

or her ability to pay at sentencing. *See, e.g., State v. Duncan*, 180 Wn. App. 245, 250-51, 327 P.3d 699 (2014), *review granted*, 353 P.3d 641 (2015). There is no evidence, however, to support this purported rationale; it is a supposition appellate courts have made to explain why a particular defendant did not insist that the sentencing court follow the law. The supposition misses the point: The legislature gave the State the burden of production, not the defendant, and for discretionary LFOs to be imposed, there must be evidence that the defendant has or will have the ability to pay those costs.

The dissent frames our disagreement as "whether we should deliver a consistent message that defendants need to raise this issue in the trial court at the time of sentencing, as contemplated by RCW 10.01.160(3), or whether we should forgive waiver, thereby creating an incentive for defendants to forgo opposing LFOs in the trial court knowing that we offer a revolving door on appeal." Dissent at 2. If this is our disagreement, it should be resolved in favor of the majority. First, RCW 10.01.160(3) does not require the defendant to raise the issue of ability to pay. It requires the State to produce evidence. *State v. Lundy*, 176 Wn. App. 96, 106, 308 P.3d 755 (2013).[1] Second, no evidence of waiver is ever present in the record. It certainly is not present in this case.

I would frame our disagreement in this manner: Whether appellate courts should continue to ignore clearly erroneous LFOs, or whether we should enforce

---

[1] The State might quarrel with having the burden of production because it lacks access to the defendant to create the proper record. This difficulty can be overcome by the State simply advising the court that prisoners have an opportunity to earn money while incarcerated and that a certain range of monthly earnings is not atypical.

RCW 10.01.160(3) and insist that evidence actually support the trial court's imposition of costs. Those adopting the dissent's position have three retorts: (1) LFO errors will rarely occur now that *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015) has directed trial courts to comply with RCW 10.01.160(3); (2) there are available alternatives for a defendant who truly cannot pay court costs; and (3) we should adhere to RAP 2.5(a)'s general rule of not reviewing unpreserved errors.

First, simply because errors may occur less frequently does not excuse an appellate court from correcting errors as they do occur.

Second, the alternatives available to a defendant erroneously ordered to pay discretionary LFOs are not *satisfactory* alternatives. For example, a personal restraint petition and a CrR 7.8(b) motion to amend a judgment have strict timeliness requirements, place the burden of production on the defendant, and involve lengthy and expensive processes. Similarly, a petition for remission under RCW 10.01.160(4) requires the defendant to prove that payment would impose a "manifest hardship." And even when a defendant meets this high standard, the trial court may still require full payment of improperly assessed LFOs by modifying the payment terms.

Third, RAP 1.2(a)—which directs liberal interpretation of the rules of appellate procedure to promote justice and facilitate decisions on their merits— permits appellate courts to review unpreserved LFO errors "because of the

3

widespread problems . . . associated with LFOs imposed against indigent defendants."
*Blazina*, 182 Wn.2d at 841 (Fairhurst, J., concurring in the result). Review and remand
of LFO errors promotes justice because the benefit of allowing those who have served
their sentences to transition into society substantially outweighs the minimal cost of a 10-
minute remand hearing.

We should not shy away from correcting legal errors. But not all alleged LFO
errors require remand. I encourage a practical approach that would remand only those
cases where imposition of discretionary LFOs was questionable. This necessarily
requires an individualized review.

Here, the trial court ordered Mr. Rieker to pay $1,850 of LFOs in monthly
installments of not less than $25, commencing on his incarceration. The trial court also
ordered payment of restitution, with the amount to be determined at a later hearing.
Because RCW 9.94A.760(1) requires restitution to be paid prior to court ordered LFOs,
Mr. Rieker may not be able to make payments toward his LFOs until after he is released
from prison. If so, the trial court will need to also inquire whether Mr. Rieker, who has
been convicted several times of first degree theft and other felonies involving dishonesty,
will likely ever be employed at a job that pays more than subsistence wages. Because
Mr. Rieker's present or future ability to pay LFOs is questionable, given the above
considerations, remand is appropriate.

Lawrence-Berrey, J.

4

Dissent No. 32174-6-III

SIDDOWAY, C.J. — (dissenting in part) I concur in the majority opinion with the exception of one issue: I would not exercise discretion to consider Mr. Rieker's challenge, for the first time on appeal, to the trial court's finding that he has the ability to pay the legal financial obligations (LFOs) imposed.

The majority states that in *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), the Washington Supreme Court "clarified" that RCW 10.01.160(3) requires the trial court to "'do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry.'" Majority at 25 (quoting *Blazina*, 182 Wn.2d at 838). No clarification of the requirement that the court "take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose" should have been needed. RCW 10.01.160(3). No reported decision has ever held that an unconsidered boilerplate finding would suffice. Washington statutes clearly require more. *See id.*; RCW 9.94A.760(2); *State v. Duncan*, 180 Wn. App. 245, 249-50, 327 P.3d 699 (2014) *review granted*, 183 Wn.2d 1013, 353 P.3d 641 (2015). The principal importance of *Blazina* was its stern reminder to trial courts of what the law requires, its

identification of circumstances that a trial court may consider in determining ability to pay, and its holding that RAP 2.5(a) applies if a defendant fails to address the issue of ability to pay in the trial court. "[A] defendant has the obligation to properly preserve a claim of error" and "appellate courts normally decline to review issues raised for the first time on appeal." *Blazina*, 182 Wn.2d at 830, 834.

All of the judges on this court recognize that discretionary LFOs that a defendant cannot reasonably be expected to pay will increase the difficulty of reentering society. Our disagreement is whether we should deliver a consistent message that defendants need to raise this issue in the trial court at the time of sentencing, as contemplated by RCW 10.01.160(3), or whether we should forgive waiver, thereby creating an incentive for defendants to forgo opposing LFOs in the trial court knowing that we offer a revolving door on appeal.

The rationale for refusing to entertain issues for the first time on appeal is well settled: we "insist[ ] on issue preservation . . . to encourage 'the efficient use of judicial resources.' . . . Issue preservation serves this purpose by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Robinson*, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011) (citation omitted) (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)). The requirement for preserving error applies regardless of who bears the burden of proof, and I trust that the concurrence will not be understood to suggest otherwise. We noted in *Duncan* that a defendant facing

2

sentencing has an incentive not to raise the question of his ability to pay financial

obligations as an explanation for why we see a failure to preserve this error so often—we

did not characterize that as the rationale for RAP 2.5(a). *Duncan*, 180 Wn. App. at 250.

A defendant who has made what will often be a strategic decision not to raise the

issue at sentencing has other avenues for relief from overly burdensome LFOs.[1]  I

respectfully dissent from the majority's decision to remand this case for consideration of

an issue that should have been raised in the trial court.

Siddoway, C.J.
_____
Siddoway, C.J.

---

[1] A defendant can bring a timely motion under CrR 7.8(b) and he or she can seek remission of the obligations under RCW 10.01.160(4).  If the decision was not strategic and a defendant's circumstances would have established inability to pay at the time of sentencing, the defendant can file a personal restraint petition supported by evidence of ineffective assistance of counsel.